FILED
2016 Sep-30  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NANCY SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:14-cv-00555-AKK** |
| **CITY OF HUNTSVILLE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Nancy Smith, individually and as the administrator of the Estate of Minor

N.S. ("N.S."), brings this action against the City of Huntsville, Chief of the City of

Huntsville Police Department Lewis Morris, Sergeant Dwayne McCarver,[1] Agent

Tesla Hughes, and Agent Joseph Blake Dean (collectively, "Defendants") alleging

claims under 42 U.S.C. § 1983 and the Alabama Wrongful Death Act.[2] *See*

---

[1] McCarver, who was a sergeant at the time of the incident in question, is now a lieutenant, doc. 96-4 at 6. Because the claims against McCarver are related to his actions while a sergeant, the court will refer to him as Sergeant McCarver.

[2] Smith also sued Lieutenant Lee Tribble and Deputy Chief Kirk Giles. After both moved for summary judgment, docs. 70 and 71, Smith moved to dismiss these two defendants, doc. 80. Smith's motion to dismiss is **GRANTED**, and Tribble and Giles's motions for summary judgment are **MOOT**. Tribble and Giles also filed a motion for attorney fees, doc. 82, in which they contend that Smith pursued the claims against them despite notice that they were not involved in any of the conduct Smith challenges. Doc. 82 at 2–3, 5. While Tribble and Giles are correct that they placed Smith on notice, the fact remains that Smith added these two defendants after "Defendant City and any and all other Defendants employed by the City of Huntsville" identified them in their Rule 26 Disclosures as persons who may have discoverable knowledge,

*generally* doc. 65. The court has for consideration the motion to dismiss filed by the City, Chief Morris, Sergeant McCarver, Officer Dean, and Officer Hughes, doc. 68. The motion is fully briefed, docs. 69; 77; 78, and ripe for review. For the reasons stated more fully below, the court concludes that the motion is due to be granted in part, and denied in part.

## I.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Twombly*, 550 U.S. at 557).

---

doc. 84 at 1–2, and their deposition testimonies hinted that they may have some responsibility for the matters alleged in the complaint, *see* doc. 84 at 3–4. As such, the court cannot find that Smith acted unreasonably and vexatiously in pursuing her claim against them. Therefore, the motion for attorney fees is **DENIED**. Finally, Smith has also alleged that she is bringing claims against Lieutenant Jimbo Winn; however, she never served him with process in this suit. As such, her claims against him are **DISMISSED** for failure to timely serve under Fed. R. Civ. P. 4(m).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citations omitted) (internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## II.      FACTUAL BACKGROUND[3]

Many of the facts alleged in Smith's Second Amended Complaint are familiar to all involved with this suit. *See generally* docs. 1; 26; 29; 48. In essence, Smith alleges that, on June 13, 2013, Officers Dean and Hughes of the Huntsville Police Department ("HPD"), who are also members of the Madison-Morgan

---

[3] "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting G*SW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)). In other words, the "facts" here are taken directly from the Second Amended Complaint, doc. 65.

County Strategic Counterdrug Team ("STAC"), apprehended N.S., threw him to the ground, climbed on top of him, and attempted to discharge mace on him. Doc. 65 at 3–5. N.S. had placed in his mouth a small baggie the officers suspected contained illegal narcotics. While Dean was on top of him, N.S. began choking and was "unable to breathe for an extended period of time." *Id.* at 5. When N.S. started choking, Dean delivered "two brachial plexus stun strikes" to N.S., and Hughes attempted to extricate the baggie from N.S.'s mouth using an ink pen, "a glitter gel pen," and the butt of a flashlight in an attempt to clear N.S.'s airway. *Id.* at 5–6. As Hughes attempted to extricate the baggie, Dean, who remained on top of N.S., placed his arm around N.S.'s neck and pulled N.S.'s head up approximately one foot from the ground in a "temporary neck restraint." *Id.* at 6. Dean and Hughes then handcuffed N.S., and, because N.S. had begun vomiting, turned N.S. so that he lay on his back. *Id.* at 6–7. By the time paramedics arrived, N.S. had "turned blue" and was unconscious. *Id.* Dean and Hughes relayed only that N.S. had "overdosed" and stopped breathing, and failed to tell the paramedics about N.S.'s additional injuries or the brachial stun strikes, neck restraints, and upper body compression. Doc. 65 at 7. Hospital records reflect that N.S., who died five days later, suffered cardiac arrest while in Dean and Hughes's custody. *Id.* at 8.

Smith further alleges that the City was on notice of the HPD's failure to train and supervise its officers. Allegedly, none of the defendant officers had received

"formal" STAC training and, instead, only received informal, on-the-job training. *Id.* at 9, 11–12. Important here, officers and agents from multiple law enforcement agencies and narcotics organizations comprise the STAC Unit, and the STAC agents at HPD state that "training [consists of] getting a manual." *Id.* at 11–12 (internal quotations omitted). Hughes testified that when STAC policies contradict HPD policies, she follows her STAC training. *Id.* at 11. Moreover, Smith pleads that Dean and Hughes never received training on the reasonable use of force during an arrest or detention, or the necessary medical care for an individual who is choking or vomiting. *Id.* at 10. Although suspects commonly insert narcotics into their mouths (with many choking on these narcotics), HPD apparently has no policies regarding a proper response to a choking incident. Doc. 65 at 10. Also, HPD fails to train its STAC agents with regard to confidential informant procedures such that so-called "take downs" and arrests using confidential informants "routinely, and as a custom and practice," violate HPD policies and procedures. *Id.* at 11.

Smith also claims that HPD's supervision of its officers violates the Constitution. Allegedly, the City fails to supervise and investigate alleged misconduct because Internal Affairs does not notify officers under investigation (or even of the initial complaint against an officer), and does not contact "critical witnesses" for questioning. *Id.* Smith also alleges that HPD conducts cursory

investigations into alleged misconduct, because it routinely finds that the officers' actions were "in policy." *Id.* at 10. Additionally, Chief Morris has purportedly failed to train and supervise STAC agents because, HPD protocol only requires officers to provide written notification to supervisors after they have used a baton or oleoresin capsicum ("O.C.") spray, which is sometimes referred to as "pepper spray" or "mace." *Id.* at 6, 11, 14. Other uses of force (for example, with hands, feet, or fists) are excluded from the reporting requirements, and officers do not have to submit "individual case narratives" for supervisory review. *Id.* at 11.

Finally, Smith maintains that the City and HPD are on notice of their officers' use of excessive force, because the Department of Justice has intervened in incidents involving excessive force since 2011. Doc. 65 at 8–9.

### III.   ANALYSIS

Smith advances three claims: (1) a § 1983 claim for failure to train, supervise, and investigate against the City, Chief Morris, and Sergeant McCarver (Count I)[4]; (2) a § 1983 claim for failure to intervene against Officers Hughes and

---

[4] Count I does not specify whether the claims against Chief Morris and Sergeant McCarver are in their individual or official capacities. *See generally* doc. 65. Smith argues in her response that she asserted claims against the two "in both their individual and official capacities, depending on the specific claims." *See* doc. 77 at 2. As the court explained, however, in its Memorandum Opinion on Defendants' first Motion to Dismiss in this case, doc. 26 at 14, to the extent that Smith asserts claims against Chief Morris and Sergeant McCarver in their official capacities, these claims fail. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued

Dean (Count II); and (3) a claim of wrongful death under the Alabama Wrongful Death Act, Ala. Code § 6-5-410 (1975), brought via § 1988, against Officers Hughes and Dean (Count III). Doc. 65 at 9–15. Defendants have moved to dismiss Count I in its entirety and Counts II and III in part. *See* doc. 68. The court addresses each count below.

### A.  Failure to Train, Supervise, and Investigate (Count I)

Smith contends that, despite having notice of the deficiencies in HPD's training, the City, Chief Morris, and Sergeant McCarver failed to adequately train officers on: the use of force during an arrest or detention; emergency medical responses for individuals who may be choking, unable to breathe, or vomiting; and the use of informants. Doc. 65 at 10, 12. Smith alleges that, although HPD officers testified that it was "common" for a narcotics arrestee to insert narcotics into his mouth, Chief Morris and Sergeant McCarver still failed to train officers on how to respond to a choking incident. *Id.* at 10. Those defendants also allegedly failed to properly train Hughes and Dean by not providing them "formal" STAC training, not requiring that they maintain a copy of the STAC directives, and not requiring that they provide written notification subsequent to uses of force not involving a

---

directly[.]") (citations omitted). Indeed, Smith seems to recognize that maintaining this suit against Chief Morris and Sergeant McCarver would be "redundant," *see id.*, because she asserts that her allegations against them "are equivalent to making a claim against Defendant City of Huntsville," *see* doc. 77 at 3. As such, Defendants' motion is due to be granted as to the claims against Chief Morris and Sergeant McCarver in their official capacities, and the court will treat the claims against these two Defendants as individual capacity claims.

baton or O.C. spray. *Id.* at 9, 11. Finally, Smith alleges that these defendants failed to properly investigate the alleged misconduct of Hughes and Dean by having a policy that does not require Internal Affairs to inform the officers it is investigating them or to contact critical witnesses. *See id.* at 10.

### 1.    Failure to train

As stated previously, Smith alleges that the City, Chief Morris, and Sergeant McCarver failed to train HPD officers in three areas, i.e., the use of force, the medical assistance that should be provided to persons choking or vomiting from ingesting drugs during an arrest, and the use of informants. As to the claim against the City, "[a] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cty. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[T]here are only 'limited circumstances' in which an allegation of a failure to train . . . can be the basis for liability under § 1983," and "these 'limited circumstances' occur only where the municipality inadequately trains . . . its employees, this failure to train . . . is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted). "Failure to train

can amount to deliberate indifference when the need for more or different training is obvious . . . and when the failure to train is likely to result in the violation of a constitutional right." *Belcher v. City of Foley*, 30 F.3d 1390, 1397–98 (11th Cir. 1994) (citations omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bryan Cty.*, 520 U.S. at 409).

### i.  Excessive force and the use of informants

Smith has failed to plead previous constitutional violations necessary to sustain her failure to train on the use of force claim against the City. For example, the Second Amended Complaint does not mention or describe any previous incidents beyond vaguely alleging that the Department of Justice has intervened in excessive force incidences "occurring as far back as 2011." Doc. 65 at 8–9. This broad allegation — that complaints of HPD's excessive force have led to federal government intervention in certain incidents — is not sufficiently specific to put the City on notice as to the type of alleged constitutional violations that occurred in this case. *See Riley v. Newton*, 94 F.3d 632, 638 (11th Cir. 1996) ("[T]he deficiency [in a failure to train claim] 'must be closely related to the ultimate injury.'") (quoting *Harris*, 489 U.S. at 388).

Notwithstanding Smith's failure to recount previous constitutional violations, "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan Cty.*, 520 U.S. at 409. To the extent Smith argues that the lack of "formal" training for STAC agents results in a "highly predictable" likelihood of a violation of constitutional rights, the court finds that the failure to provide additional training to police officers, who are, presumably, already versed in the constitutional limits of their actions, fails to amount to a situation in which "the unconstitutional consequences of failing to train could be so patently obvious" that the City could be liable without proof of a preexisting pattern of violations. *See Connick*, 563 U.S. at 64 (no liability for failing to train prosecutors regarding *Brady* violations because, *inter alia*, the prosecutors "were familiar with the general *Brady* rule," so failure to train on a specific factual scenario failed to assert a showing of deliberate indifference).[5] Because Smith has failed to plead facts showing that the alleged failure to provide "formal" STAC training was the

---

[5] To the extent Smith asserts a failure to train regarding using O.C. spray on a choking defendant, *see* doc. 65 at 10, there is no violation here, because Hughes "attempted to mace" N.S., *id.* at 6, but did not actually succeed. Additionally, Smith's general claims for a failure to train on the "reasonable use of force during an arrest or detention," "the use of force and proper medical treatment," "emergency medical training," and the "use of [confidential] informants" fail on the basis that they are conclusory and unsupported by specific factual allegations. *See* doc. 65 at 9–10, 12; *Iqbal*, 556 U.S. at 678 (noting that mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient to state a claim).

"moving force" behind the altercation with N.S., this claim against the City is due to be dismissed.

Similarly, Smith's claim for failure to train against Chief Morris and Sergeant McCarver in their individual capacities on these two areas is due to be dismissed. To hold a supervisory official liable under § 1983 for an injury resulting from an alleged failure to train subordinates, Smith must show that the "failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains." *Belcher*, 30 F.3d at 1397 (internal quotations and citations omitted). Because Smith has failed to establish deliberate indifference insofar as STAC training is concerned, Smith cannot assert that Chief Morris' and Sergeant McCarver's actions "actually caused" N.S.'s harm.

ii. <u>Training on incidents involving choking or vomiting</u>

The motion is due to be denied with regard to the alleged failure to train officers regarding the response to incidents involving choking or vomiting. Accepting the allegations in the complaint as true, during the course of the altercation with N.S., and after ascertaining that N.S. was choking, Dean and Hughes struck him twice in the neck; remained on top of him; placed an ink pen, a glitter pen, and the butt of a flashlight down N.S.'s throat to extricate the blockage from his throat; and then handcuffed him. Doc. 65 at 5–6. Moreover, when N.S.

began vomiting instead of leaning N.S. onto his side, Dean and Hughes laid him on his back. *Id.* at 7. The officers and their supervisors were on notice that individuals trying to avoid arrest for drug-related offenses regularly insert narcotics into their mouths and choke as a result. *Id.* at 7, 10. Accordingly, the court finds that Smith has asserted a plausible claim that the failure to train on these circumstances amounts to "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations," *Bryan Cty.*, 520 U.S. at 409, and that "the unconstitutional consequences of failing to train could be so patently obvious," *see Connick*, 563 U.S. at 64. Because Smith has stated a plausible claim that this lack of training was a "moving force" behind N.S.'s death, her claim for failure to train as to choking and vomiting arrestees against the City, Chief Morris, and Sergeant McCarver may go forward.[6]

---

[6] Defendants argue that these claims are "completely unrelated to the underlying constitutional violation" of excessive force. *See* doc. 69 at 12. The court disagrees. For one, the alleged choking and vomiting was part and parcel of the alleged excessive force against N.S. — indeed, as alleged, the officers blocked N.S.'s airway, handcuffed him, struck him in the neck twice, and then, perhaps most relevantly, placed pens and flashlights down his throat to try to clear the blockage. The officers' use of these pens and a flashlight appears to be "closely related to [his] ultimate injury," so the court declines to find that the lack of such training is outside the scope of Smith's failure to train claim. *See Harris*, 489 U.S. at 391 ("Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury."). Defendants' reliance upon *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) and *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996), to argue that the court should dismiss the failure to train as to vomiting and choking arrestees claims because Smith does not specifically allege claims for deliberate indifference to serious medical needs or for denial of medical care, doc. 69 at 12–13, is misplaced. Unlike in those cases, where the courts found no predicate constitutional violation, here, the court does not view Dean's and Hughes's actions as exclusive to a medical indifference claim, but rather, as integral aspects — especially given the inference of causation here and the fact that the officers' actions and N.S.'s choking

## 2. *Failure to supervise*

A plaintiff may assert a claim for failure to supervise only in "limited circumstances." *See Gold*, 151 F.3d at 1350 (internal quotation omitted). With respect to a municipality, these circumstances occur "only where the municipality inadequately . . . supervises its employees, this failure to . . . supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Id.* Smith has sufficiently pled that the City's failure to supervise — by, for example, leaving to an officer the decision about whether to notify her supervisor about some uses of force, excusing the officer from documenting such incidents of force, and by not requiring officers to submit individual case narratives, particularly as to whether the officer's behavior complies with HPD policies — was the "moving force" behind Dean's and Hughes's actions against N.S. Based on the pleadings, allowing officers to use the type of force used against N.S., with the knowledge that it would not trigger any obligation to report, is sufficient at this stage to demonstrate circumstances under which the City would have an "obvious need" for supervision. *Cf. Vineyard v. Cty. of Murray*, 990 F.2d 1207, 1212–13   (11th Cir. 1993) (plaintiff satisfied the "obvious need" standard for a failure to supervise claim when the defendant had no

---

and vomiting happened at the same time — of her predicate allegation of excessive force. *Cf. Hendon v. City of Piedmont*, 163 F. Supp. 2d 1316, 1328–29 (N.D. Ala. 2001) (examining whether the fact that a plaintiff had a heart attack as a result of an altercation with police created a reasonable inference of excessive force).

policy and procedures manual, did not require deputies to file an arrest report when beatings and confrontations occurred, and did not investigate complaints). As such, the claim against the City for failure to supervise as to the force used against N.S. may go forward. *Cf. id.* (noting that "[a] record of complaints gives the sheriff notice that a particular officer may have a problem that could be corrected").

Smith alleges against Chief Morris and Sergeant McCarver the following failures to supervise: (1) the failure to require written notification to supervisors when force, other than the use of a baton or O.C. spray, is used on an individual, doc. 65 at 11; (2) the failure to require that individual case narratives be provided for review because officers are not required to inform supervisors of actions of nonlethal force that fall outside of baton and O.C. spray use, *id.*; and (3) the failure to regularly put officers on notice when they are under investigation, *id.* at 10. Smith asserts that these alleged failures create "an atmosphere of misconduct with no remedial action," and demonstrate "their deliberate indifference that has resulted in widespread unreported and undisciplined excessive force" by HPD and STAC officers. *Id.* at 11–12. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotations and citations omitted). "Supervisory liability under § 1983 occurs either when the supervisor

*personally participates* in the alleged unconstitutional conduct or when there is a *causal connection* between the actions of the supervising official and the alleged constitutional deprivation." *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (emphasis added, citations omitted). A plaintiff can establish the necessary "causal connection" by: (1) showing "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisors' custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully"; or (4) when "the supervisor knew the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1361 (alteration in original) (internal quotations and citations omitted). "[T]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (internal quotations and citation omitted).

Smith does not assert that Chief Morris or Sergeant McCarver personally participated in the alleged unconstitutional conduct. Instead, she asserts that there was a causal connection between their alleged failure to supervise and the purported constitutional violations that occurred. As pleaded, Smith has sufficiently alleged supervisory liability against Chief Morris and Sergeant

McCarver as relates to the reporting of use of force, on the basis of a custom or policy that resulted in deliberate indifference to constitutional rights. For example, Smith alleges that Chief Morris only required reporting for use of force that involved O.C. spray or batons, and exempted from documentation any force implemented with hands, feet, or fists. *See* doc. 65 at 11. Moreover, Smith alleges that Chief Morris and Sergeant McCarver did not require subordinate officers to submit case narratives that would require an officer to inform a supervisor of his actions, and that officers do not regularly receive notice when they are under investigation for their actions, which purportedly further shields officers from "feeling" accountable for the use of force. *Id.* at 10–11. Thus, Smith has sufficiently alleged that the failure to require reporting on the use of force is both an "obvious need" and that such policies could be the "moving force" behind the officers' decisions regarding the use, type, and extent of force used against N.S.[7]

---

[7] The other claims that Smith brings against Chief Morris and Sergeant McCarver fail to rise above conclusory allegations. *See, e.g.*, doc. 65 at 11–12 (noting that Chief Morris and Sergeant McCarver have "failed to train and supervise STAC agents in regard to confidential informant procedures such that 'take downs' and arrests . . . are routinely, and as a custom and practice, in direct contradiction of HPD policies and procedures;" "allowed an atmosphere of misconduct with no remedial action" and have been "deliberat[ly] indifferen[t, which] has resulted in widespread and unreported and undisciplined excessive force," and that they have failed to hold STAC officers accountable to learning the directives they are expected to implement and follow). These conclusory claims cannot survive Defendants' motion to dismiss. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted). Moreover, to the extent that Smith tries to use the HPD's alleged failure to investigate the N.S. incident as support for her failure to supervise claim, the court notes that an insufficient investigation *after the fact* cannot be the "moving factor" behind the officers' actions on the night at issue here.

Thus, as it relates to the failure to supervise claim, the motion is denied solely as to the alleged failure to supervise regarding the reporting of use of force.

### 3.    *Failure to investigate*

With respect to Smith's failure to investigate claim against the City, the court notes, as a threshold matter, that the City may only be sued "when execution of a government's policy or custom . . . may fairly be said to represent official policy [and] inflicts the injury [for which] the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Critical here, the official policy must be the "moving force" behind the constitutional violation. *Id.* at 694. Smith has failed to plead facts giving rise to a reasonable inference of causation. Although Smith asserts that the City failed to investigate the altercation with N.S., she fails to explain how such an investigation (which necessarily would have occurred *after the fact*) would have prevented the death of her son. *See Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) ("[T]he failure to investigate or take disciplinary action following the subject incident cannot support a claim of municipal liability, because the after-the-fact inadequate investigation or discipline could not have been the legal cause of the plaintiff's injury.") (citing, *e.g.*, *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999)). Moreover, although Smith argues that this purported "lack of investigation into . . . N.S.'s death is merely one example of [the] City's

continuous refusal to investigate instances of use of force," *see* doc. 77 at 4, she fails to outline in her complaint other instances in which the City failed to investigate — particularly, *before* the incident involving N.S. Smith merely pleads that the Department of Justice has intervened in other putative excessive force incidents involving the HPD, and that the HPD does not notify officers about complaints or investigations against them.[8] Such conclusory allegations are insufficient to survive the City's motion to dismiss.

The failure to investigate claim is also due to be dismissed as to Chief Morris and Sergeant McCarver. To advance a claim against an official in his individual capacity, "liability may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions and the violation." *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086–87 (11th Cir. 1986). Here, Smith has not alleged any claims showing that these two defendants "personal[ly] participat[ed]" in the incident, beyond her allegation that Sergeant McCarver told Dean and Hughes that their actions were "in policy." This allegation is insufficient to

---

[8] Smith also references Paragraphs 48, 49, and 50 of her Second Amended Complaint in support of her failure to investigate claim. *See* doc. 77 at 4–5. However, these facts were asserted in support of her failure to train and supervise claims. Additionally, even if Smith had asserted that the failure to require documentation for use of force (except O.C. spray or a baton) or that STAC agents follow STAC policy instead of HPD policies, these facts do not support a finding that HPD's alleged failure to investigate constitutional harms was the "moving force" behind Dean and Hughes's actions here.

establish Sergeant McCarver's participation in the harm (and, as Defendants point out, actually indicates that an internal investigation *did* occur following the incident involving N.S.). To the extent Smith relies upon a "causal connection" linking the officers' actions to the alleged violations, the court notes that Smith has advanced no facts that other failures to investigate (or a pervasive culture of refusing to investigate) caused the alleged violations against N.S.

### 4.   *Conclusion*

To summarize, at to Count I, Smith may proceed with her claims against the City, Chief Morris, and Sergeant McCarver, regarding the failure to train officers on how to respond to choking and vomiting arrestees and the failure to supervise regarding reporting the use of force. In all other respects, the motion to dismiss is due to be granted.

### B.   **Failure to Intervene (Count II)**

Defendants' motion to dismiss Smith's failure to intervene claim against Dean and Hughes is due to be denied for the following reasons. *See* doc. 69 at 13–15. First, as to Defendants' contention related to the officers' placement of handcuffs on N.S., while it is true that "the application of de minimis force, *without more*, will not support a claim for excessive force in violation of the Fourth Amendment," *see Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (emphasis added), and that handcuffing a suspect is typically considered *de minimis* force, *see*

*Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003), the court declines to view the handcuffing here in a vacuum. The combination of events from the day in question, including Dean and Hughes's decision to handcuff N.S., as well as their other actions — which included "tak[ing] down" N.S., climbing on his back, executing two brachial plexus stun strikes, and inserting pens and a flashlight butt into his throat — rises above a finding of *de minimis* force. *See Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (viewing the totality of the officer's actions, including the fact that he had handcuffed the plaintiff, in finding excessive force).

Second, the motion is also due to be denied as to Defendants' contentions regarding Hughes's "attempt[]" to spray N.S. with O.C., *see* docs. 65 at 6; 69 at 14; 78 at 5. Hughes's "attempt[]" occurred while N.S. was allegedly choking and while Dean was still on top of him. Although Smith does not clarify what this "attempt[]" entailed, "[p]hysical contact is not required for an excessive force claim — patently unreasonable conduct is." *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007) (citations omitted). Accepting the allegations set forth in the Second Amended Complaint as true, the court finds that she has asserted a plausible claim for failure to intervene regarding the O.C. spray attempt.

Finally, as to Defendants' contention that Smith insufficiently pleaded that the officers "fail[ed] to provide medical relief" to N.S., *see* doc. 69 at 15, a review of the pleading shows that Smith advances specific allegations regarding a failure

to provide medical care. For example, Smith asserts that Dean and Hughes realized that N.S. was choking and "refused to immediately call the paramedics" or provide assistance, and that the officers placed N.S. on his back lying face up after he began vomiting and again provided no assistance while N.S. was choking. *Id.* at 5–9.

"A complaint need not specify in detail the precise theory giving rise to recovery [and a]ll that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food & Commercial Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989). Because Smith's allegations put Defendants sufficiently on notice of the failure to intervene allegations, the motion to dismiss this claim is due to be denied.

## C. Wrongful Death Under Alabama Wrongful Death Act (Count III)

Finally, Defendants seek to dismiss Smith's wrongful death claim. Specifically, Defendants attack the allegations regarding Dean and Hughes's decision to handcuff N.S. and the use of O.C. spray, *see* doc. 65 at 13–14, stating that "handcuffing, without more, cannot be the basis of an excessive force claim as it is de *minimis* force," doc. 69 at 14, and that because Hughes never actually sprayed N.S. with O.C., Dean and Hughes "cannot be liable for excessive force that simply did not occur," *id.* at 15. First, for the reasons outlined above, the contention that the use of handcuffs is *per se de minimis* is unavailing. Asking a

court to view the use of handcuffs in isolation from all other factual allegations in an excessive force claim is akin to requesting that the court suspend reality and assume, instead, that it can separate incidents that are all interconnected. The court declines to do so.

The court also rejects Defendants' contention that it should dismiss Smith's allegation that Dean and Hughes used excessive force by "pepper spray[ing N.S.] in the face," *see* docs. 65 at 14; 69 at 15, because it contradicts the facts Smith pleaded previously (namely, that Hughes attempted to spray N.S. with O.C. but did not). Fed. R. Civ. P. 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."

## IV.   CONCLUSION AND ORDER

To summarize, except solely as to the following claims: (1) Count I — the allegations against the City, Chief Morris, and Sergeant McCarver for failure to train insofar as they are related to an arrestee who is choking or vomiting, and for failure to supervise insofar as they are related to reporting the use of force; (2) all claims asserted in Count II; and (3) all claims asserted in Count III, the motion to dismiss, doc. 68, is **GRANTED**. The court will address these surviving allegations in its opinion on the pending motions for summary judgment. Smith's motion to dismiss Lieutenant Lee Tribble and Deputy Chief Kirk Giles, doc. 80, is **GRANTED**. Accordingly, Lieutenant Tribble and Deputy Chief Giles' motions for

summary judgment, docs. 70 and 71, are **MOOT**. Finally, Lieutenant Tribble and

Deputy Chief Giles' motion for attorney fees, doc. 82, is **DENIED**.

 **DONE** the 30th day of September, 2016.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE