# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **NANCY SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | Civil Action Number |
| ) | **5:14-cv-00555-AKK** |
| **CITY OF HUNTSVILLE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

Nancy Smith, individually and as the administrator of the Estate of Minor N.S. ("N.S."), brings this action against the City of Huntsville, Chief of the City of Huntsville Police Department ("HPD") Lewis Morris, Sergeant Dwayne McCarver, Agent Tesla Hughes, and Agent Joseph Blake Dean (collectively, "Defendants") alleging claims under 42 U.S.C. § 1983 and the Alabama Wrongful Death Act, Ala. Code § 6-5-410 (1975).[1] *See generally* doc. 65. The court has for consideration motions for summary judgment filed by the City (doc. 86), Dean

---

[1] In light of the court's rulings on the motion to dismiss, *see* doc. 130, only the following claims remain: (1) the claims under 42 U.S.C. § 1983 (Counts I and II) that (a) the City, Chief Morris, and Sergeant McCarver failed to properly train officers regarding choking and vomiting arrestees; (b) the City, Chief Morris, and Sergeant McCarver failed to properly supervise officers regarding reporting the use of force; (c) Agent Dean failed to properly intervene when (i) Agent Hughes attempted to use O.C. spray against N.S., (ii) handcuffs were used on N.S., and (iii) Agent Hughes failed to provide medical relief to N.S.; and d) Agent Hughes failed to intervene when (i) handcuffs were used on N.S., and (ii) Agent Dean failed to provide medical relief to N.S.; and (2) the wrongful death claim in Count III.

(doc. 87), Hughes (doc. 88), Sergeant McCarver (doc. 89), and Chief Morris (doc. 90), and a motion to strike filed by Smith (doc. 104). The motions are fully briefed, docs. 91; 92; 93; 94; 95; 112; 113; 114; 116; 118; 120; 124; 125; 126; 127; 128; 129, and ripe for review.[2]

The tragic events here stemmed from what started as a routine drug arrest. Unfortunately, when Officer Hughes approached N.S. and ordered him to walk toward her, N.S. struck Hughes in the head and attempted to flee. In turn, Hughes grabbed N.S., and Officer Dean tackled both of them to the ground. While on the ground, N.S. violently resisted the officers — which included kicking Hughes in the chest —, disobeyed their multiple commands, and prevented them from gaining control of and handcuffing him. At some point during the struggle, despite the officers' instructions to the contrary, N.S. placed a baggie of ecstasy he had on his person into his mouth and, according to the officers, proceeded to chew it. Fearing

---

[2] Smith moves to strike the affidavits of Sergeant McCarver and Officer Dean, filed in support of their motions for summary judgment. Insofar as Smith alleges that the court should strike the affidavits because Defendants did not disclose them prior to their filing for summary judgment, the motion is due to be denied, because Rule 56 does not require a party to disclose, as part of its discovery disclosures, an affidavit submitted in support of a motion for or in opposition to summary judgment. Likewise, the motion fails under the "sham affidavit doctrine." *See Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984) (allowing a party to strike offending sections of affidavits that present an "inherent inconsistency" with deposition testimony). Although Smith broadly asserts that "the [a]ffidavits of the deposed witnesses and/or Defendants provide testimony that is inexplicably conflicting with the information provided in their respective deposition testimonies," *see* doc. 104 at 3, she fails to identify to which "deposed witnesses and/or Defendants" she refers, or to point the court toward a specific conflict between any deposition and affidavit testimony. Because such a conclusory allegation, without more, cannot provide the basis for relief, Smith's motion is due to be denied.

that swallowing the drugs would cause injury to N.S., the officers instructed N.S. to spit the baggie out, and, when he failed to comply, Hughes used various items – including an ink pen, a glitter eye pen, and the butt of a flashlight – to pry N.S.'s teeth apart in an attempt to stop him from ingesting the drugs and to retrieve the baggie. The officers contend that N.S. made sounds that led them to believe N.S. had chewed the baggie open, escalating the urgency of the situation, and that the situation further escalated when N.S. began to sound like he was choking on the baggie. Ultimately, despite the officers' successful retrieval of the baggie, N.S.'s condition deteriorated, and he lost consciousness shortly before paramedics arrived. He died five days later at Huntsville Hospital, at the age of seventeen. The autopsy report proved inconclusive as to the cause of death, but noted injuries consistent with a struggle, and N.S.'s medical reports found the presence of amphetamines and opiates in his system. Viewing the officers' actions, as the Supreme Court has instructed, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396 (1989), and with the understanding that "[a] law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest," *Brown v. City of Huntsville*, 608 F.3d 724, 740 (11th Cir. 2010) (citations omitted), the court finds that Smith has failed to establish that Officers Dean and Hughes acted unreasonably under these unfortunate circumstances or that they

violated N.S.'s constitutional rights. Accordingly, and for the reasons stated more fully below, Defendants' motions for summary judgment are due to be granted.

## I.      STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL ALLEGATIONS

### A.    STAC Investigation of N.S.

Dean and Hughes are HPD officers who are also members of the Madison-Morgan County Strategic Counterdrug Team ("STAC"). STAC is a federally

funded, multi-jurisdictional task force comprised of multiple agencies located in Madison and Morgan Counties, Alabama, that is charged with the investigation of narcotics crimes. Docs. 96-4 at 6, 8; 99-1 at 3; 99-2 at 2. Although STAC is "basically autonomous," HPD is its "ultimate overseer," because HPD facilitated and manages STAC's federal funding. Doc. 96-4 at 6.

On June 13, 2013, a confidential informant informed Dean that the informant could purchase "molly" — the street name for 3, 4-methylenedioxymethamphetamine[3] ("MDMA"), which is also known as ecstasy — from a seventeen-year-old male known as N.S. Doc. 99-2 at 2. Dean and Hughes directed the confidential informant to call N.S., and arrange to meet N.S. shortly thereafter, to purchase four grams of MDMA. Docs. 96-2 at 18; 99-2 at 2. At some point during the meeting with the confidential informant, Hughes left to conduct surveillance on N.S.'s house, doc. 96-2 at 18, with which STAC and the HPD had some familiarity, because HPD had executed a search warrant at the home six months earlier when N.S.'s mother called the police after licking "stickers" she found in the house and experiencing an accelerated heart rate, *id.* at 17; doc. 96-1 at 6. After arranging a meeting between the confidential informant and N.S., Dean, who knew N.S.'s age, developed an operational plan and relayed that plan to

---

[3] *See* DRUG ENFORCEMENT ADMINISTRATION, THE FACTS ABOUT MDMA: ECSTASY & MOLLY (2014), *available at* https://www.dea.gov/pr/multimedia-library/publications/molly.pdf (last visited Sept. 30, 2016).

Hughes, Sergeant McCarver, and Terry Lucas, another member of STAC. Docs. 96-2 at 18; 99-2 at 2. Sergeant McCarver, who was Dean's STAC supervisor, approved the plan, which called for the officers to intercept N.S. as he exited his residence to meet the informant, locate the MDMA, and then obtain a search warrant for the house to confiscate the remainder of the drugs. Docs. 96-2 at 9, 18, 22; 96-3 at 19; 96-4 at 18; 99-2 at 2; 99-21 at 3. Pursuant to the operational plan, Hughes and Dean intended to approach N.S., speak to him, pat him down for weapons, and attempt to locate the narcotics. Doc. 96-2 at 20. In the event N.S. became combative, the plan called for the officers to "tactically" secure him and call for assistance. Doc. 99-21 at 3.

### B.    N.S.'s Altercation with Dean and Hughes

The confidential informant and Dean drove in separate cars to the agreed-upon sale location.[4] Doc. 96-2 at 20. Hughes, whose car was closer to N.S.'s house, saw N.S. exit and walk toward the prearranged meeting place. Doc. 96-2 at 20. Hughes then informed Dean by radio that she was exiting her car to approach N.S. *Id.*; doc. 99-2 at 2.

As Hughes approached N.S. on the sidewalk, Dean began slowly driving towards them. Docs. 96-2 at 20; 99-2 at 2. Hughes, who was wearing jeans, tennis shoes, a blue t-shirt, and a hat, also wore a black vest that was solid black in the

---

[4] N.S. instructed the informant to park down the street from his house because N.S. was "pretty sure" his neighbors knew N.S. was selling drugs. Doc. 97-5 at 1:40–1:52.

front but stated "POLICE" in white letters in the back. Docs. 98-15 at 2; 97-4 at 7:06–7:16. Hughes had her gun and badge on her right hip. Docs. 96-2 at 20; 99-2 at 5; Doc. 97-4 at 7:05–7:16. When she reached N.S., Hughes identified herself as a police officer, and requested that N.S. walk towards her. Docs. 96-2 at 20; 96-3 at 31; 99-2 at 3. N.S. complied, but then struck Hughes in the head and attempted to run.[5] Docs. 99-2 at 2–3; 96-2 at 20. As N.S. fled, Dean pulled up in his truck, turned on his emergency lights, and exited his vehicle.[6] Docs. 96-2 at 20; 96-3 at 31; 99-2 at 3. Dean then "took [N.S. and Hughes] to the ground." Docs. 96-2 at 20–21; 96-3 at 31, 33. N.S. "continued to fight" and was "throwing elbows, punching, [and] twisting." Docs. 96-2 at 21; 96-3 at 31; 99-6 at 3. After unsuccessfully instructing N.S. to stop resisting numerous times, Dean delivered two brachial plexus strikes[7] to the side of N.S.'s neck in an effort to control N.S. Docs. 96-2 at 21; 99-2 at 3. Apparently, because N.S. kept moving and fighting Dean, one of the strikes "glanced" the right side of N.S.'s face. Doc. 99-2 at 3. Eventually, Dean turned N.S. onto his stomach, straddled N.S., and was able to

---

[5] Hughes maintains that N.S. turned to run before N.S. struck her. Docs. 96-3 at 31; 98-6 at 3. Then, as N.S. ran, Hughes grabbed his shirt, and N.S. swung and elbowed her in the head. Docs. 96-3 at 31; 98-6 at 3.

[6] Unlike regular patrol cars, STAC vehicles are not equipped with cameras that turn on automatically when the car's emergency lights are activated. Doc. 96-2 at 16–17; 96-3 at 32–33 ("[T]here are no cameras in undercover narcotics vehicles. . . . They're not allowed in the vehicles.").

[7] As explained by Chief Morris, a brachial plexus stun strike is "a hard-hand technique that's designed to deliver a blow to an individual to create a momentary stun so that [the officer] can move in to take control." Doc. 96-8, at 25.

control N.S.'s right arm with his knee. Doc. 96-2 at 21. However, because N.S. continued to fight, Dean "did not have control" over the rest of N.S.'s person. Doc. 96-2 at 21.

During the struggle, Dean noticed that N.S. had a large plastic baggie in his left hand. Although Dean "tried to get [N.S.] to stop," N.S. placed the baggie in his mouth. Docs. 96-2 at 21; 99-2 at 3. Concerned that the baggie contained a large quantity of drugs that would kill N.S. if N.S. consumed the baggie, Dean told N.S. to "spit the bag out" and that "if [he] swallowed it, it may kill [him]." Docs. 96-2 at 21; 96-3 at 31. Dean continued to try to gain full control over N.S., because "you can't put handcuffs on until somebody's under control. It's impossible." Doc. 96-2 at 22. This led Dean to straddle N.S.'s back. Doc. 96-2 at 22–23, 37. Dean, who still had his knee on N.S.'s right arm, then gained control of N.S.'s left arm; however, N.S. was "still not under control" and Dean could not handcuff him, because N.S. was "resisting and fighting and trying to pull away." Doc. 96-2 at 23.

Hughes, who was holding N.S.'s legs, asked if she could let go to check N.S.'s mouth. Doc. 96-3 at 31. Based on Dean's affirmative response, Hughes released N.S.'s legs. *Id.* However, N.S. began to kick Hughes in the chest, and Hughes realized that "Dean wasn't able to control [N.S.] due to his violence." *Id.* As a result, Hughes returned to restrain N.S.'s legs and did so until Dean indicated that Hughes could let go and return to N.S.'s mouth. *Id.* According to Hughes, "it

sounded like there was a plastic bag in [N.S.'s mouth]" and "he was actively chewing." *Id.* When Hughes finally saw the plastic baggie in N.S.'s mouth, she realized that N.S. would not be able to swallow it. *Id.* Although Hughes and Dean continued to instruct N.S. to spit the baggie out because "it might kill [him]," N.S. continued to actively fight against them and chew the baggie. *Id*; docs. 96-2 at 23; 99-2 at 3. Then, because N.S. was "violently fighting and clenching his jaw," Hughes placed an ink pen between N.S.'s teeth to keep his mouth open.[8] Docs. 96-2 at 23; 96-3 at 31–32; 99-2 at 3. Despite using the pen to prop up N.S.'s teeth, Hughes was unable to retrieve the plastic baggie. Docs. 96-2 at 24; 96-3 at 32. As a result, Hughes retrieved oleoresin capsicum ("O.C.") spray — which is sometimes referred to as "pepper spray," *see* doc. 94 at 11 — from Dean's car but could not use it, because the can malfunctioned. Doc. 96-2 at 24. Hughes decided instead to use the end of her flashlight to keep N.S.'s mouth open, and then attempted to retrieve the plastic baggie using a "glitter pen or a glitter eyeliner." Doc. 96-2 at 24; 96-3 at 32. To give Hughes a better angle and assist her in retrieving the baggie from N.S.'s mouth, Dean placed N.S. in an "upper body compression hold," without applying any pressure. Doc. 96-2 at 25. The hold consisted of Dean, whose forearm and arm were around N.S.'s neck, lifting N.S.'s head up above the ground.

---

[8] Dean is adamant that Hughes did not "st[i]ck [the pens or the flashlight] into [N.S.'s] mouth or into [N.S.'s] throat" but, rather, simply used them to open N.S.'s mouth. Doc. 96-2 at 29.

Docs. 96-2 at 25; 99-2 at 3. The maneuver proved unsuccessful in facilitating the retrieval of the baggie from N.S.'s mouth. Doc. 96-3 at 32.

At this point, N.S. — who was still "actively fighting" — swung his arm at Hughes and tried again to swallow the plastic baggie. *Id.* According to Hughes, N.S. "took a deep inhale at that point and then [N.S.'s] breathing sounded labored like he was actually choking on the bag."[9] *Id.* Dean immediately called for paramedics, then he and Hughes again advised N.S., who was still struggling to pull away, to spit out the baggie, and they released all pressure on N.S. and "solely focused on [N.S.]." Docs. 96-2 at 26; 96-3 at 32; 99-2 at 3. Hughes again attempted to open N.S.'s teeth with a pen and the end of her flashlight. Doc. 96-3 at 32. When other HPD officers arrived to the scene, Hughes asked if they had anything she could use to remove the plastic baggie on which N.S. was choking. *Id.* Because none of the officers had anything she could use, Hughes reached into N.S.'s mouth with two of her fingers and successfully retrieved the baggie out of his throat and placed it a few feet away. Docs. 96-2 at 25; 96-3 at 32. The baggie

---

[9] To the extent that Smith seeks to rely upon her expert John Ryan's testimony as to when N.S. began choking, *see* doc. 116 at 11, the court finds that he is not a competent witness for these facts. Indeed, instead of relying upon a study or an autopsy, for instance, Ryan seeks only to reiterate his understanding of Dean's and Hughes's perceptions of when N.S. began choking. *See* doc. 96-14 at 59–60. Smith cannot hide Ryan behind the guise of "expert witness" in order to rephrase and alter Dean's and Hughes's testimony about their personal observations. *See Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (noting that "experts . . . are not 'fact witnesses'").

field tested (and laboratory reports later confirmed) positive for MDMA.[10] Docs. 96-5 at 16; 99-2 at 4; 101-3 at 2.

After Hughes retrieved the baggie from N.S.'s throat, N.S. stopped actively resisting, but was still breathing and had a pulse. Doc. 98-6 at 5. However, because N.S. still made sounds that indicated he might still be choking, Hughes again tried to open N.S.'s mouth, to ensure that nothing else was lodged in N.S.'s throat. Docs. 96-2 at 27; 98-6 at 5; 99-2 at 3. When N.S. refused to open his mouth, Hughes forced it open. Docs. 98-6 at 5; 99-2 at 3–4. In light of N.S.'s condition, Dean, who at this point had handcuffed N.S., contacted emergency personnel again and asked them "to step it up" because N.S. continued to choke.[11] Doc. 96-2 at 26–27. At this point, N.S. began to vomit, and Dean and Hughes rolled N.S. onto his side to prevent him from aspirating. Docs. 96-2 at 28; 96-3 at 34; 98-6 at 5–6; 99-2

---

[10] Officers subsequently executed a search warrant on N.S.'s house, where officers found various drugs and drug paraphernalia. Doc. 99-2 at 4.

[11] Hughes reports that one reason the N.S. incident was significant is because of the "complications" that occurred during the take down that required she report the incident to her supervising officers. Doc. 96-3 at 30. When asked to elaborate as to why she had to call her supervising officers, Hughes stated, "Due to us having to call HEMSI and [N.S.] being a Priority One." Doc. 96-3 at 30. The term "Priority One" is used to describe someone who does not respond to the agents when they speak to him. *Id.* Smith argues that this statement substantiates her allegation that, at the time Dean initially called HEMSI to respond to the scene, "N.S. was considered a 'Priority One'" and therefore could not communicate with Dean and Hughes. *See* doc. 116 at 11. This contention ignores that Hughes used "and," which suggests that the Priority One label was not tied to the call for paramedics. As such, the court does not read Hughes's statement to indicate that they had called HEMSI *because* N.S. had already become a Priority One, nor does it support Smith's contention that N.S. was already unresponsive the first time Dean called HEMSI.

at 3. However, because it sounded like N.S. was still choking, Hughes and Dean rolled him onto his back to ensure that his throat was clear. Docs. 96-2 at 28; 96-3 at 32; 98-6 at 6. When they found nothing in N.S.'s mouth, Hughes and Dean left N.S. on his side in case he vomited again. Doc. 96-3 at 32.

"Directly prior" to the paramedics' arrival, N.S. became unconscious. Doc. 96-3 at 32, 35. When the paramedics arrived, Dean or someone else removed the handcuffs and informed the paramedics that N.S. had stopped breathing, but never relayed that Hughes had used pens or a flashlight on N.S.'s mouth. Docs. 96-2 at 28; 96-3 at 36–37; 99-2 at 4. An officer also informed the paramedics that N.S. was choking, docs. 98-9; 98-10, and, as one of the paramedics removed the stretcher from the ambulance, an officer told her that "[N.S.] was turning blue," doc. 98-9 at 2. The paramedic observed N.S. as "pulseless and apneic" and that his face was "mottled and cyanotic." *Id.*

Immediately after the paramedics arrived, Dean called Sergeant McCarver and "notified him of the whole incident," albeit without disclosing the upper body compression hold he had executed on N.S. Doc. 96-2 at 28–29. Dean also contacted Lieutenant Jimbo Winn, who subsequently drove Dean and Hughes back to the precinct, where they met with Charlie Gray, a Major Crimes Unit investigator, and also filed a report about the incident. Docs. 96-2 at 29–30; 96-3 at 43; 96-6 at 37; 96-7 at 5. When Sergeant McCarver responded to the scene after

Dean's call, based on the severity of N.S.'s injuries, he "immediately" notified Internal Affairs, and turned the investigation over to them. Docs. 96-2 at 28; 96-4 at 24; 96-9 at 8; 99-2 at 4.

N.S. died five days later at Huntsville Hospital. Docs. 101-2 at 2; 101-19 at 2. N.S.'s autopsy report offered seven "final diagnoses,"[12] but indicated that the cause and manner of death were "[u]ndetermined." Doc. 101-2 at 2. The report noted that, because of the timing of the autopsy and the circumstances surrounding the altercation, "the level of drugs in [N.S.'s] system at the time of the incident [could not] be determined," such that "it is difficult to discern if [N.S.] died from a drug overdose or an asphyxia event exacerbated by either the occlusion of the airway by a foreign object, a possible vascular occlusion associated with the neck restraint, or from a combination of all the events that transpired." *Id.*

## C.    **HPD's Investigation of N.S.'s Death**

The HPD conducted two investigations into the incident, one led by the Major Crimes Unit, and the other by Internal Affairs. Both investigations exonerated the officers. Docs. 96-7 at 10; 100-3 at 3.

---

[12] These seven diagnoses were: (1) "Anoxic/hypoxic ischemic encephalopathy;" (2) "Minor blunt force injuries" that consisted of, first, "[c]ontusions of the face, oral mucosa, chest, left upper extremities and abdomen" and "[a]brasions of the oral mucosa, left ear and chest;" (3) "Bilateral pulmonary congestion and edema;" (4) "Acute and remote myocardial ischemia;" (5) "Acute hepatitis;" (6) "Ansarca;" (7) "Trecheitis." Doc. 101-2 at 2.

### 1.    *Major Crimes Unit Investigation*

Investigator Gray led the Major Crimes Unit investigation, which probed whether the officers committed a crime during the arrest of N.S. Doc. 96-7 at 5–6, 9. Gray did not obtain statements from Smith, who is N.S.'s mother, or from N.S.'s sister, both of whom arrived at the scene just before the paramedics transported N.S. to the hospital. Doc. 96-7 at 12.[13] Instead, Gray recorded his observations of the scene; interviewed and obtained statements from the confidential informant, Officer Hughes, Officer Dean, and the paramedics; obtained the ambulance report "run sheet," the "call for service" report, a copy of the Event Chronology, all 911 recordings, and all medical records for N.S. from Huntsville Hospital; and interviewed N.S.'s neighbors John and Linda Frost, Earnest Colin, Larry Richards, and Paula Payton. *See generally* doc. 98-4; *see also* docs. 96-2 at 29–30; 96-3 at 43; 96-7 at 8; 97-3; 97-6; 97-7; 98-4 at 2, 5–6; 98-6; 98-7; 98-9; 98-10; 98-11; 98-12. After reviewing the materials, Gray determined that the officers had committed no crimes. Doc. 96-7 at 10.

---

[13] N.S.'s sister arrived at the scene before Smith. The other HPD officers, who were then at the scene, did not let her near N.S. and, as far as the court can discern, she did not witness the incident between her brother and the officers, aside from briefly seeing him "[f]acedown on the ground in [their] neighbor's yard . . . [and] [s]everal police officers . . . standing around in a circle with him." Doc. 96-12 at 7–8. In any event, she called her mother at work, and Smith arrived shortly before N.S. was taken to the hospital. Docs. 96-1 at 8–10; 96-12 at 9.

2.     *Internal Affairs Investigation*

Internal Affairs carried out an independent investigation to determine whether Hughes and Dean violated any policies or procedures. Doc. 96-9 at 9. As part of its investigation, Internal Affairs reviewed the After Action Report prepared by Sergeant McCarver, the written statements of Hughes, Dean, Officer Oaks, and Paramedics Burke and Porter, in-car video footage from Officer Oaks' vehicle, recordings of dispatch-radio traffic and the confidential informant's phone transaction with N.S., photographs of the crime scene, the Event Chronology, case reports by STAC officers, and N.S.'s autopsy report. *See generally* doc. 100-3; *see also* docs. 97-3; 97-4; 97-5; 97-7; 98-6; 98-7; 98-8; 98-9; 98-10; 98-15; 98-16; 98-17; 99-2; 100-2; 100-3 at 4–6; 100-4. Ultimately, Internal Affairs concurred with Sergeant McCarver's finding in the After Action Report, and concluded that Dean and Hughes "followed all policies and procedures with their actions and judgment" and "that this incident was IN POLICY." Doc. 100-3 at 3 (emphasis in original).

D.     **The City's Police Officer Training and Supervision**

1.     *General Training*

To become an HPD police officer, trainees must successfully complete an 18-week academy ("HPD Academy") certified by the Alabama Peace Officers' Standards & Training Commission ("APOST"). Doc. 100-5 at 4. Trainees receive instruction on record-keeping and report writing, the use of firearms, the use of

force, ground fighting, defensive tactics (including upper body compression locks and the use of O.C. spray), first aid, CPR,[14] and the procedures to follow when a person is rendered unconscious or any serious physical injury occurs. Docs. 96-2 at 6–9; 100-5 at 4; 100-6; 100-7. Dean and Hughes graduated from the HPD Academy in 2006 and 2007, respectively. Docs. 96-2 at 6; 96-3 at 37; 100-19 at 16–33; 100-20 at 18–47.

After graduating from the HPD Academy, new officers complete a 14-week field training program. Docs. 96-2 at 6; 100-5 at 4. This program consists of accompanying a field training officer ("FTO") and observing how the FTO handles daily situations, including arrests, completing reports, and the use of force. Docs. 96-2 at 6; 100-5 at 4.

To supplement the initial training, HPD also conducts regular, in-service training. Doc. 100-5 at 4. This training covers topics such as: the use of force, tactical disengagement training, immigration, EMS, and active shooters. Docs. 100-5 at 4; 100-18; 100-19 at 16. According to the evidence presented, Dean and Hughes attended in-service and supplemental trainings regularly during their career with the HPD. *See generally* docs. 100-18; 100-19; 100-20.

---

[14] Dean received first aid and CPR training in 2006 and passed the respective evaluations. Doc. 100-19 at 19–20. Hughes trained in first aid and CPR in 2007, passed the respective evaluations, and was certified in CPR from August 2007 to August 2009. Doc. 100-20 at 23–31; 46–47.

### 2. *STAC Training*

Only officers with at least two years of service with the HPD and a rating above satisfactory on their most recent review are eligible to become STAC agents. Doc. 96-3 at 18. New STAC officers undergo approximately six weeks of additional training related to narcotics investigation and enforcement. Docs. 96-3 at 18; 101-1 at 3. The training consists of accompanying STAC officers in the field to learn, in part, how to conduct surveillance, evaluate and utilize confidential informants, formulate and complete operational plans, carry out takedown procedures, and complete STAC case reports. Docs. 96-2 at 6; 96-3 at 18–19; 96-6 at 10; 101-1 at 3. Because STAC recognizes that new STAC agents will not learn everything they need to know during the training period, STAC encourages new agents to use their best judgment based on the training they have received and to ask experienced STAC officers for help when they encounter a new situation in the field. Doc. 96-3 at 20. New STAC agents also receive a manual of directives titled "Madison-Morgan County STAC Team Policies and Procedures Guide" to review and implement. Doc. 96-2 at 12. STAC agents are not formally tested on their knowledge of the directives, but must merely acknowledge that they have read and understand the directives. Docs. 96-2 at 12, 39; 96-4 at 18–19; 96-5 at 18.

In addition, Sergeant McCarver, who commanded the STAC Team at the time of the incident, held weekly meetings, during which he presented recent

judicial decisions and case law related to narcotics law enforcement. Doc. 101-1 at 4.  The STAC Team also discussed ongoing STAC cases and debriefed operations at the weekly meetings. *Id.*

### 3. Choking and Vomiting

Relevant here, with respect to a choking arrestee, Dean stated he received training on the Heimlich maneuver, but that it is impossible to utilize this technique while an individual is resisting arrest. Doc. 96-2 at 23.[15] Hughes stated that her training instructed her to first check the individual's airway. Doc. 96-3 at 15. If the individual is unconscious and laying on his back, Hughes' training instructed her to perform a finger sweep to ensure there is nothing blocking the airway, and then to perform CPR, while continuing to intermittently check the airway. *Id.* at 35. If the individual is conscious, Hughes' training directed her to first attempt a finger sweep or to encourage the individual to cough the item up, and if unsuccessful, to perform the Heimlich maneuver. *Id.* at 35–36.

Although Dean testified about other incidences where suspects have placed drugs into their mouths, he could not recall whether he had received training on what to do when an individual places a baggie into his mouth that could potentially lead to choking, or the risks associated with applying pressure to the neck of an

---

[15] When asked, "What was your training as the first thing you're supposed to do if you believe an individual to be choking?" Dean responded, "We went through training, but I can't tell you." Doc. 96-2 at 24.

individual who may be choking. Doc. 96-2 at 21–22; 27. Likewise, Sergeant McCarver recognized rare instances in which an arrestee or potential arrestee has choked on a baggie of drugs, and testified that there is no training for officers on how to respond if someone places drugs into his mouth during an arrest. Doc. 96-4 at 49. Finally, Chief Morris stated that it was not within policy to stick a "Mag flashlight" or an ink pen into a choking individual's mouth. Doc. 96-8 at 35–36.

### 4.    *Supervision*

HPD Written Directive 101-13 Use of Force sets out the policies and procedures officers should follow during and after situations in which an officer administers force. The Directive instructs officers to document any use of force in corresponding arrest or case reports. *Id.* at 6. Officers are to notify a supervisor immediately when the use of force results in injury that requires more than simple first aid or results in death, and supervisors are instructed to respond and initiate an investigation. Doc. 97-8 at 7. The use of O.C. spray or any baton technique also requires immediate reporting to a supervisor for investigation. *Id.* at 7–8. The Directive also discusses the use of force continuum, identifying the levels of force officers can use in relation to the level of danger they face in various scenarios. *Id.* at 11.

The Post Deadly Force Procedure in Written Directive 101-13 states that the use of deadly force includes: "[a]ny serious physical injury or death caused by an

action taken by an officer (i.e., death resulting from an accident during a pursuit)." *Id.* Where an officer is involved in the use of such deadly force, the Directive instructs officers to follow a specific set of procedures, including: (1) handcuffing or securing the suspect; (2) notifying Communications and giving out any pertinent information; (3) notifying a supervisor immediately; and (4) administering first aid and/or calling for medical assistance if necessary. *Id.* at 11–12.

The first supervisor to arrive on a scene involving deadly force must follow certain protocols, including: (1) escorting the officers away from the scene and to a secure setting until the Major Crimes Unit or Internal Affairs is able to interview the officers; (2) calling the Major Crimes Unit or Internal Affairs to the scene; (3) notifying the Shift Commander; and (4) requiring the officers to undergo drug and alcohol testing if the injury or death in question is believed to have been accidental (like an accidental shooting or traffic accident). *Id.* at 13.

### III.     ANALYSIS

Smith brings three claims against Defendants: (1) failure to train, supervise, and investigate under § 1983 (Count I); (2) failure to intervene under § 1983 (Count II); and (3) wrongful death under the Alabama Wrongful Death Act , Ala. Code § 6-5-410 (1975), brought via § 1988 (Count III). *See generally* doc. 65 at 9–15. Each of these claims is premised upon the alleged constitutional violations against N.S. by Hughes and Dean. Therefore, before the court can assess whether

the City, Chief Morris, and Sergeant McCarver are liable for the actions of Hughes and Dean, the court must determine first whether these two officers violated N.S.'s constitutional rights.

### A.    Alleged Constitutional Violations

Smith claims that Hughes and Dean violated N.S.'s Fourth and Fourteenth Amendment rights through their (1) use of excessive force and (2) failure to provide appropriate medical care to N.S. *See generally* doc. 65.

#### 1.    *Excessive Force*

The Fourth Amendment's guarantee against "unreasonable searches and seizures," U.S. Const. amend. IV, "encompasses the plain right to be free from the use of excessive force in the course of an arrest[, investigatory stop, or other 'seizure' of his person]," *Graham*, 490 U.S. at 395–96. If "the nature and quality of the intrusion on the [plaintiff's] Fourth Amendment interests" outweigh "the countervailing government interests at stake," the seizure has violated the plaintiff's constitutional rights. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *see also Graham*, 490 U.S. at 388. In the Eleventh Circuit, to determine whether the "nature and quality of the intrusion" on Fourth Amendment interests surpasses the governmental interests at stake, courts must consider: "1) the need for the application of force, 2) the relationship between the need and the amount of force used, and 3) the extent of the injury inflicted." *Vinyard v. Wilson*, 311 F.3d 1340,

1347 (11th Cir. 2002) (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)); *see also Lee v. Ferraro*, 284 F.3d 1188, 1198 n.7 (11th Cir. 2002) (referring to this three-element analysis as the "*Leslie* test").

Critically, in analyzing the force used, courts are instructed to remember that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary . . . ." *Graham*, 490 U.S. at 396–97. Moreover, the right to make an arrest or investigatory stop necessarily entails the right to use some degree of physical coercion or threat thereof. *Brown*, 608 F.3d at 737 (citations omitted). As a result, claims alleging that an officer used excessive force during the course of an arrest or other "seizure" are analyzed under an objective reasonableness standard. *Graham*, 420 U.S. at 388; *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). That is, the officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

After careful consideration of these factors, as outlined below, the court concludes that the amount of force used by Dean and Hughes was reasonable in light of the circumstances and thus, did not violate N.S.'s constitutional rights.

i.   <u>Was there a need for force?</u>

"*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Ferraro*, 284 F.3d at 1198; *see also Graham*, 490 U.S. at 396. Courts must assess these factors with the recognition that "[a] law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest." *Brown,* 608 F.3d at 740 (citing *Ferraro,* 284 F.3d at 1194).  In fact, "[f]or even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Id.* at 740 (citing *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)). However, the level of force considered reasonable lessens when an arrestee has committed a minor offense,[16] is not threatening the officer or the public, and is not resisting arrest. *Id.* at 739–40; *see also Ferraro*, 284 F.3d at 1198 (Generally, "more force is appropriate for a more serious offense and less force is appropriate for a less serious offense.").

Here, the officers suspected N.S. of possessing narcotics with the intent to distribute. This is a Class B felony and, therefore, a serious crime. *See* Ala. Code § 13A-12-211(d) (1975). Moreover, the court must also consider the level of danger

---

[16] Minor offenses include crimes such as disorderly conduct and obstruction. *Vinyard*, 311 F.3d at 1347; *see also Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008) ("misdemeanor obstruction is a crime of 'minor severity' for which less force is generally appropriate"); *Fils v. City of Aventura*, 647 F.3d 1272, 1288–89 (11th Cir. 2011).

N.S. posed to the officers. Generally, "resisting arrest *without force* does not connote a level of dangerousness that would justify a greater use of force." *Fils*, 647 F.3d at 1288 (emphasis added). However, here, Defendants assert that N.S. hit Hughes in the head, attempted to flee, and, when tackled, resisted arrest by "throwing punches and swinging his elbows . . . [,] [and] twisting and turning." Docs. 92 at 9; 93 at 9. N.S. also "kick[ed] Agent Hughes in the chest." Docs. 92 at 9, 29; 93 at 9, 29. As described by the officers, N.S.'s violent resistance to his arrest connotes a level of dangerousness that would justify a somewhat greater use of force from the officers to detain him and effectuate his arrest. *See Brown*, 608 F.3d at 739 ("[T]he use of pepper spray is not excessive force in situations where the arrestee poses a threat to law enforcement officers or others, uses force against officers, physically resists arrest, or attempts to flee.");[17] *Vinyard*, 311 F.3d at 1348 ("Courts have consistently concluded that the use of pepper spray is reasonable, however, where the plaintiff is either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital.") (citations omitted).

In sum, the severity of N.S.'s suspected crime, his physical and violent resistance, and his attempt to flee, lead this court to conclude that Hughes and

---

[17] The Eleventh Circuit generally does not draw a distinction between chemical spray and tasers. For example, *Fils* involved a taser, but the court found "no meaningful distinction between the two under the[ present] circumstances." *Fils*, 647 F.3d at 1289 (comparing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (stating that, while a taser shock is "unpleasant," it "did not inflict any serious injury" on the plaintiff) with *Vinyard*, 311 F.3d at 1348 (describing pepper spray as "generally of limited intrusiveness")).

Dean acted reasonably, under the first factor, in using a heightened level of force to carry out N.S.'s arrest.

ii.   The relationship between the need for and the amount of force used

The court must next consider whether the officers used force that was proportional to the force called-for by the situation. *See Vinyard*, 311 F.3d at 1347. Smith alleges, and Defendants do not deny, that Dean and Hughes tackled N.S. to the ground, attempted to spray N.S. with O.C. spray, handcuffed him, subjected him to two brachial plexus strikes, and used the butt of a flashlight and a glitter eye pen to pry his mouth open. As previously stated, "[f]or even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown*, 608 F.3d at 740. With respect to the specific force used against N.S., first, the attempted use of O.C. spray was reasonable in light of N.S.'s continuing resistance to the officers' attempts to gain control of him. Second, N.S. was suspected of committing a felony, fled from the officers, violently resisted arrest, and attempted to dispose of the drugs by swallowing them. The officers' use of the force described to effectuate N.S.'s arrest was reasonable based on N.S.'s actions. *See, e.g.*, *Brown*, 608 F.3d at 739–40; *Vinyard*, 311 F.3d at 1348.

As to the officers' attempts to retrieve the drugs, when an officer reasonably believes that an arrestee has placed drugs into his mouth, the officers can use a higher level of force to prevent the arrestee from swallowing or ingesting the

drugs. *See Johnson v. Rogers*, No. 3:10-CV-50-WKW, 2012 WL 3231327, at \*8 (M.D. Ala. July 11, 2012), *report and recommendation adopted sub nom. Johnson v. Rodgers*, No. 3:10-CV-50-WKW, 2012 WL 3206238 (M.D. Ala. Aug. 6, 2012). In *Johnson*, the officers reasonably believed that the plaintiff had placed crack cocaine into his mouth to hide it from the officers, and the court ruled that the officers' acts of placing the plaintiff

> in a chokehold to prevent him from swallowing the drugs suspected to be in his mouth, as it does not violate any clearly established right for law enforcement officers, who reasonably believe a suspect is attempting to swallow and/or destroy drug evidence, to use reasonable force to prevent such occurrence, including holding the suspect's throat and/or attempting to pry open the suspect's mouth by placing pressure against his/her jaw and nose

were not unreasonable "[u]nder the tense and rapidly evolving situation confronting [the officers.]" *Id.* at \*8.[18]

There are limits, however, to the amount of force officers can use on an arrestee whom they reasonably suspect has placed drugs into his mouth. For instance, in *King v. Reap*, a plaintiff placed a baggie of crack cocaine into his

---

[18] Citing "*Williams v. Bramer,* 180 F.3d 699, 704 (5th Cir.1999) (with probable cause, an officer can search a suspect's mouth for drugs); *United States v. Caldera,* 421 F.2d 152, 153 (9th Cir.1970) (when officers observe a suspect attempting to swallow drugs, they may use reasonable force to prevent it); *see also Espinoza v. United States,* 278 F.2d 802, 804 (5th Cir.1960) (in a case in which federal officers who, without a warrant, obtained drug evidence from defendant's mouth as he was attempting to swallow and destroy the evidence "by grabbing the defendant about the throat," and "attempting to pry open his mouth by placing pressure against his jaw and nose," the court found defendant's objection that search and seizure occurred without a warrant and was an excessive use of force lacked merit)."

mouth, and when he refused to open his mouth, the officers "slammed him to the ground," and "beat him in the back with a flashlight while attempting to open his mouth." 269 F. App'x 857, 858 (11th Cir. 2008). The officers "ground[ed] his face into the ground," "pepper-sprayed him, and then forced a metal object into [his] mouth, which sliced the interior of his mouth and tongue, chipped a tooth, and caused swelling to his lips." *Id.* The Eleventh Circuit held that this amount of force was unreasonable, because the plaintiff "was not merely 'manhandled': he was beaten, while handcuffed, to the extent that two or possibly three of his ribs were broken." *Id*.

*King* is distinguishable, however, because there is no evidence that Hughes and Dean "manhandled" N.S. or beat him while attempting to retrieve the baggie. Death, especially of a seventeen year old, is a tragic event. However, the record before this court does not support a finding that the officers violated N.S.'s Fourth Amendment rights. In light of the escalating urgency of the situation, and viewing the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, the force these officers employed was proportional to the established need to detain N.S. and retrieve the narcotics he was attempting to swallow.

### iii. The level of injury

The court must now weigh the first two *Leslie* factors against the extent of

the injury inflicted. *Vinyard*, 311 F.3d at 1347 (*citing Ferraro*, 284 F.3d at 1197–98; *Leslie*, 786 F.2d at 1536). This Circuit has held that a "typical arrest involves some force or injury," even for minor offenses, and that such injury, therefore, is *de minimis*. *Johnson*, 2012 WL 3231327, at *8 (quoting *Rodriguez v. Farrell*, 280 F.3d, 1341, 1351 (11th Cir. 2002) (citing *Nolin*, 207 F.3d at 1258 n.4). In contrast, when the plaintiff incurs severe injuries, the officers' actions may be unreasonable, depending on the urgency presented by the circumstances. *See King*, 269 F. App'x at 859.

Here, N.S.'s autopsy concluded that N.S.'s cause of death is unknown. Doc. 101-2 at 2–3. The medical report indicates that N.S. "had full cardiopulmonary arrest," doc. 101-4 at 11, "was showing developing pulmonary edema/hemorrhage," *id.* at 7, and that N.S.'s "[u]rine drug screen [tested] positive for amphetamines and opiates,"[19] *id.* at 8. N.S.'s additional injuries included "[c]ontusions of the face, oral mucosa, chest, left upper extremities and abdomen" and "[a]brasions of the oral mucosa, left ear and chest." Doc. 101-2 at 2. Even accepting that the officers' acts contributed to N.S.'s injuries, the evidence also supports a finding that N.S.'s *own* actions, such as attempting to chew and swallow a plastic baggie filled with MDMA and his continuing resistance, including

---

[19] The autopsy report states "The . . . blood collected upon the decedent's arrival into the hospital had been discarded prior to the request for autopsy examination. Therefore, the level of drugs in the decedent's systems at the time of the incident cannot be determined." Doc. 101-2 at 3.

kicking Hughes in the chest, also contributed to his injuries. The injuries directly resulting from the force used by Hughes and Dean — contusions and abrasions of the face, ears, oral mucosa, chest, left upper extremities, and abdomen — are consistent with the injuries courts have found as reasonable for a suspect who fled and resisted arrest to have incurred. *See, e.g.*, *Johnson*, 2012 WL 3231327, at *8 (quoting *Farrell*, 280 F.3d at 1351) (in turn citing *Nolin*, 207 F.3d at 1258 n.4) (holding that the plaintiff's medically diagnosed bruising of the next and right rib, which was consistent with being placed in a chokehold and hit in his ribcage, were *de minimis* injuries). While the use of the flashlight, ink pen, and glitter eye pen is odd and certainly suggests a gap in the training and equipping of officers, there is no evidence that Hughes used the objects beyond the exterior of N.S.'s mouth, "up to his teeth." Docs. 96-2 at 29; 96-3 at 32; 101-2 at 3. Further, there is no evidence that these objects punctured N.S.'s mouth or throat, or caused N.S. to choke. The only "objects" that seem to have been inserted into N.S.'s mouth cavity were Hughes' two fingers, which she successfully used to scoop the baggie out of N.S.'s mouth while he was choking, and to check for any remaining objects blocking N.S.'s airway. Based on the record before this court and the pertinent case law, Smith has failed to establish that Hughes and Dean used excessive force during the arrest of N.S.

### 2.    *Deliberate indifference to serious medical needs*

Smith asserts also that Hughes and Dean violated the Fourth and Fourteenth Amendments by failing to provide medical relief to N.S. Doc. 65 at 7, 9–10. The court construes this as a claim of deliberate indifference to serious medical needs under the Fourteenth Amendment.[20] To prevail on this claim, Smith "must satisfy both an objective and a subjective inquiry. First, [Smith] must prove an objectively serious medical need. Second, [Smith] must prove that the [government] official acted with deliberate indifference to that need." *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 (11th Cir. 2004) (quoting *Bozeman v. Orum,* 422 F.3d 1265, 1267 (11th Cir. 2005)) (*per curiam*) (internal quotations omitted).

Smith easily satisfies the first element. "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). The medical need is serious if it is "one that, if left unattended, 'pos[es] a substantial risk of serious harm.'" *Farrow v. W.*, 320 F.3d 1235, 1243 (11th Cir.

---

[20] "Claims of deliberate indifference to the serious medical needs of pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause rather than by the Eighth Amendment's Cruel and Unusual Punishment Clause, which governs similar claims by convicted prisoners." *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 (11th Cir. 2007) (citing *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 n.6 (11th Cir.1997)). Therefore, we analyze Smith's claim under the decisional law of both amendments.

2003) (quoting *Taylor v. Adams,* 221 F.3d 1254, 1257 (11th Cir. 2000) (internal quotations omitted). N.S.'s breathing difficulties qualify as an objectively serious medical need — N.S. started to choke on a plastic baggie and could not breathe, vomited after Hughes retrieved the plastic baggie from his mouth, and stopped breathing completely and "turn[ed] blue" before paramedics arrived.

Next, to prove that the officers acted with "deliberate indifference," Smith must show: "(1) that [Defendants] knew of a risk of serious harm; (2) that [they] disregarded that risk; and (3) that the conduct of [the officers] amounted to more than gross negligence." *Andujar*, 486 F.3d at 1203–04 (internal citations omitted). "Negligence . . . even rising to the level of medical malpractice, does not constitute deliberate indifference." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). Rather, for an officer's response to a serious medical need to rise to deliberate indifference, the treatment must be "so cursory as to amount to no treatment at all." *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000) (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)) (internal quotations omitted). Relevant here, because Smith essentially contends that the officers delayed in providing treatment to N.S., a "delay in treatment for obviously serious conditions where 'it is apparent that delay would detrimentally exacerbate the medical problem,' the delay does seriously exacerbate the medical problem, and the delay is medically unjustified[,]" would rise to the level of deliberate

indifference. *Id.* at 1259–60 (quoting *Hill*, 40 F.3d at 1187–89). However, the length of the delay is critical, and, in that respect, "a split-second, emergency choice between two options . . . under emergency circumstances demanding an immediate decision" is distinct from longer time frames of delay in treatment. *Id.* at 1260; *see also Andujar*, 486 F.3d at 1203 (no constitutional violation for a delay "by two hours or less" when officers took arrestee to the hospital to stitch up his bleeding wounds, because the original officers had already treated his wounds while at the scene, his "vital signs were good," and this "short delay was tolerable to give the police an opportunity to book [him]").

Turning now to the present facts, Smith has failed to show that the officers acted with deliberate indifference. Based on the record before the court, the officers did not disregard the risk N.S.'s condition posed. In fact, when the officers realized N.S. was choking, Dean immediately called for paramedics. Moreover, Dean and Hughes "released pressure" on N.S., and Hughes opened N.S.'s mouth to remove the plastic baggie. After removing the baggie from N.S.'s mouth, Hughes checked again for blockage. When N.S. began to vomit, the officers rolled N.S. onto his side and then checked his airway again because it still sounded like he was choking.[21] As noted in *Taylor*, merely sending N.S. to the hospital by calling the

---

[21] Even if the court were to determine that, at that point, the cops had no need to handcuff N.S. after they removed the blockage, there is no evidence to support that Defendants handcuffed N.S. with the intent to disregard a risk to N.S.'s health. If anything, it seems the officers were trying to

paramedics would have amounted to "some medical care." 221 F.3d at 1259. Here, the officers not only called for paramedics, but also actively attempted to help N.S.

Unfortunately, "directly prior" to the paramedics' arrival, N.S. stopped breathing and was "turning blue." Docs. 96-3 at 35, 42; 98-10 at 2. Because there is no evidence as to whether the officers attempted CPR or waited for the paramedics to arrive, the court assumes that the officers did not attempt CPR, especially in light of Chief Morris's testimony that HPD no longer trains its officers to use CPR and other first aid. Doc. 96-8 at 35 (stating that "first response is now for medical attention to fall to the fire . . . and ambulance service"). Still, Smith has not provided any evidence to demonstrate that a significant amount of time passed between the moment N.S. stopped breathing and the arrival of the paramedics. Moreover, because this was an emergency situation and the paramedics were en route, any split-second decision the officers may have made in deciding to wait for the paramedics, paired with the other acts they took to help N.S., does not rise to the level of deliberate indifference.  In fact, because the officers followed policy by calling the paramedics instead of carrying out CPR, "[e]ven if that compliance were medically unreasonable . . ., the existence of the policies and their dictates militates against concluding that [Defendants] actions

---

both secure N.S. and treat his serious medical needs.  At most, the act would be considered negligent, which does not meet the threshold for deliberate indifference. See *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) ("[D]eliberate indifference plainly requires more than gross negligence.") (citation omitted).

were wanton." *Taylor*, 221 F.3d at 1260 (recognizing that the jail nurse's actions of sending the arrestee to the hospital without carrying out any assessment or treatment was in line with the written jail policy "requiring incoming unconscious detainees to be 'referred immediately for emergency care'"). In conclusion, based on the record before the court, Smith has failed to establish that Defendants exhibited a deliberate indifference to N.S.'s serious medical needs.

Because the officers did not subject N.S. to excessive force or exhibit deliberate indifference to N.S.'s medical needs, Smith has failed to establish a violation of N.S.'s constitutional rights. Consequently, and as explained briefly below, Smith's remaining claims also fail.

### B.    Count I – Failure to Train, Supervise, and Investigate under 42 U.S.C. § 1983

#### *1.    Municipal Liability Under 42 U.S.C. § 1983*

"A municipality may be liable under § 1983 for the actions of its police officers only if the municipality is 'found to have itself caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory.'" *Ludaway v. City of Jacksonville, Fla.*, 245 F. App'x 949, 951 (11th Cir. 2007) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007)). Therefore, because in order to establish municipal liability under § 1983, a plaintiff must show that his constitutional rights were violated, and Smith has failed to

show that the officers violated N.S.'s constitutional rights, the City's motion for summary judgment is due to be granted as to Count I.

2.    *Supervisory Liability Under 42 U.S.C. § 1983*

"Supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). Again, because Smith has failed to establish a constitutional violation, her claims in Count I against Chief Morris and Sergeant McCarver fail.

## C.    Count II – Failure to Intervene under 42 U.S.C. § 1983

In Count II, Smith asserts that Dean and Hughes "failed to attempt to prevent each other from using excessive force in violation of Minor N.S.'s constitutional rights." Doc. 65 at 13. It is clear that, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998) (quoting *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986)). In light of the court's finding

that the officers did not violate N.S.'s constitutional rights, Dean and Hughes's

motions for summary judgment are due to be granted as to Count II.[22]

### D.    Count III – Wrongful Death

In Count III, Smith asserts that Hughes and Dean are liable for N.S.'s death

because they "caused the death of Minor N.S. by using excessive force[.]" Doc. 65

at 13–14. "[W]hen a *constitutional violation* actually causes the injured parties

death, a §1983 claim can be asserted through the Alabama wrongful death statute,

Ala. Code § 6–5–410." *See Estate of Gilliam ex rel. Waldroup v. City of Pratville*,

639 F.3d 1041, 1047 (11th Cir. 2011) (emphasis added).[23] Summary judgment is

---

[22] Even if Hughes and Dean had violated N.S.'s constitutional rights, the officers would have been entitled to qualified immunity. Their use of force did not violate clearly established law because their actions in this emergency situation were reasonable and necessary under the circumstances. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The Circuit has found that similar types of force, such as chokeholds, are reasonable when an arrestee attempts to swallow drugs. *Espinoza v. United States*, 278 F.2d 802, 803–04 (5th Cir. 1960) (holding "that no more force was used than was reasonably necessary" when federal officers grabbed defendant "about the throat, choking him and attempting to pry open his mouth by placing pressure against his jaw and nose" to prevent him from swallowing and destroying "what appeared to be . . . a quantity of narcotics"). *See Bonner v. Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981) (*en banc*) (adopting pre-1981 Fifth Circuit cases).

[23] The United States Supreme Court recognizes that federal law does not cover "the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant." *Robertson v. Wegmann*, 436 U.S. 584, 589 (1978) (quoting *Moor v. County of Alameda*, 411 U.S. 693, 702 n.14 (1973) (internal quotations omitted). Where federal law is "deficient" in addressing an issue, "§ 1988 instructs us to turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are 'not inconsistent with the Constitution and laws of the United States.'" *Wegmann*, 436 U.S. at 588 (quoting 42 U.S.C. § 1988).  Precedent in the Northern District of Alabama finds that

due to be granted on this claim in light of the court's finding that Smith has failed to establish a constitutional violation.

## IV.     CONCLUSION

In sum, this Court holds that Defendants did not violate N.S.'s constitutional rights under §1983. As Counts I, II, and III all hinge on a violation of N.S.' constitutional rights, Defendants' motions for summary judgment are due to be granted. The court will issue a separate order dismissing this case with prejudice.

**DONE** the 30th day of September, 2016.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

federal law is deficient with respect to survival, that the Alabama wrongful death act may be adopted by reference through through § 1988, that the policies of the federal civil rights statutes and the Alabama wrongful death act are not inconsistent, and that the Alabama act should be adopted in toto.

*Brown v. Morgan County, Ala.*, 518 F.Supp 661, 665 (N.D. Ala. 2013). Under Alabama's survivorship law, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute, Ala. Code § 6–5–410." *Gilliam*, 639 F.3d at 1047.